Mr. Regan, Justices, if I may reserve a few minutes for rebuttal. You have five minutes in reply. Thank you. With respect to this matter, I believe there is an undisputed- Who are you? What's your name? I'm sorry, my name is Gary Newland on behalf of the petitioner. Mr. Eckberg, who was injured while in the employ of Town & Country. With respect to this case, I think there's an undisputed injury with respect to June 5th, 2007, where Mr. Eckberg injured his hip. The issue is the nature and extent of that injury. Prior to June 5th, 2007, there's no evidence Mr. Eckberg had ever injured his hip. This is his right hip. Counsel, before we get too far into this, as a threshold matter, did your brief contain a copy, do you have an appendix containing a copy of the arbitrator's decision? I believe it is in the appendix. Apologize if it's not. Tell us if it's in there. The arbitrator's decision actually, I don't believe is in there, but the commission's decision is in there. Does the rule require the arbitrator's decision also? You're now aware of that? You were not aware of that before? I was not aware of that. It's clearly stated in the rules. Well, the commission's decision is attached. It does recite the arbitrator's decision. Not the rule. Your brief could be stricter for that. I would ask that the justices not strike the brief. It was an oversight. If I may, the record is complete other than that. And there are, in fact, there's a complete record that was submitted to the appellate court here. The decision of the commission does discuss the arbitrator's decision. In reviewing for your argument today, did you notice that your opponent evidently noted that you didn't include the arbitrator's decision and included it in an appendix in his brief? He- Just out of curiosity. Well, yes, it is. Raising a red flag or something that maybe- It is, that is correct, Justice. It is attached to the brief of my opponent. It is, so it is a part of the record, just not submitted by myself. So, it is included. All right, remember one thing, if you don't remember anything, these rules in the Supreme Court are not advisory, they're mandatory. Yes. You can still strike your brief. I do understand. All right, let's get to the gist of this. We've got an arbitrator that said that the current condition of ill being was not causally related. There had been a break in the causal connection because of an unrelated illness. The commission reverses it, says that the finding of the current condition of ill being was in fact causally related to his injury. We've got a trial judge that reverses that and reinstates the arbitrator's decision. And you have the testimony of Dr. Gutiles stating that his impression is that the work stirred up an arthritic hip process and that's why he gets pain and disability. And he's there to think, therefore, the trial judge erred by substituting her judgment for that of the commission, and it should be reversed. Is that it in a nutshell? Well, there's also Dr. Crane's opinion, and there's also Dr. Sladek's opinion. You've got Sladek, and you've got Gutiles, and you've got Crane? Yes. Okay. And they have Mercer. Excuse me? And they have Mercer, Mercier, how do you pronounce his name? I know who you're referring to, sir. I know who you're referring to. With respect to, we can call him Dr. Mercier for today. With respect to that, yeah, there are differences of opinions here. His opinion was it was unrelated. Yes, sir. Yes, your honor. Okay. Yes, your honor. So your argument is it's up to the commission to determine who they're going to believe? Yes, your honor. That's correct. It's a battle of the experts. Conflicting medical testimony, the commission is tasked with the job of weighing the conflicting medical evidence. Therefore, the trial judge should not have substituted his or her judgment for the commission, right? Is that your argument? That is my argument. Okay, I think we understand. Are there any other questions? I don't believe there are. Thank you. Let me proceed. Good morning, your honors. Daniel Egan on behalf of Town and Country Distributors. Good morning, Mr. Newland. Your honors, before I begin, I want to advise the court that I am suffering from a condition called conductive hearing loss. And if I say I can't hear you, or I'm sorry, can you please repeat your question? Or if I ignore you, it is purely unintentional. That's all right, we're ignored most of the time anyway. Whether intentional or unintentional. Thank you for including the arbitrator's decision in your brief. You're very welcome. I did notice that, and I think that to have it for your honors was key, especially since the commission decision does not have the decision attached in the initial brief. Your honors, I believe the trial court in this instance did get it right. I believe that the commission decision is, in fact, against the manifest weight of the evidence. The arbitrator, well, let me back up. The petitioner had a condition of degenerative arthritis. That was not caused by the work accident. He had an iliopsoas, I hope I said that correctly, tendonitis. He had a strain of one of the tendons. That was treated. He underwent a course of serial x-rays from June until January of 2008, which showed no progression in the degenerative arthritic condition in the hip. The gentleman is middle-aged to a little bit older. It's not uncommon to have degenerative changes in a body part. Let me just stop you there briefly. I mean, this case proceeded on the theory that the work accident was an aggravation of a preexisting condition, correct? That's their theory, and I disagree. Why do you disagree? But that was the theory. That's their theory. The commission eventually found. They did, but in a very tortured way, and they disregarded the significant difference between a degenerative arthritis and a condition of avascular necrosis. And when they did so, they took the report of Dr. Crane and changed the words around to make it sound like there were additional changes in the hip which were not present. And as I pointed out in my brief, Dr. Crane's report discusses his treatment in February of 2008, goes on to a new paragraph and says, in addition, x-rays were performed of the right hip and showed a degenerative arthritic condition in that hip. I think this might be important, too. Didn't the evidence establish the claim that preexisting arthritic condition was asymptomatic prior to the work event? Wasn't that the evidence? That was the evidence. Doesn't that bear on whether or not the accident aggravated the preexisting condition? We don't have any. Your Honor, there's no issue that for a period of time there was an aggravation of the arthritic condition from June of 2007 until approximately January 2008. He was discharged from care in January 2008 by Dr. Sladek, having achieved maximum medical improvement with regard to the hip. He was back to work in a heavy-duty capacity as a delivery man of cases of beer to restaurants, liquor stores, and so on. And he was not under any active medical care for his hip from the period of early January 2008 until the end of February 2009. And what happened during that time, in February 2008, he was hospitalized. He had a condition of uticarial vasculitis that's completely unrelated to the work injury. It's agreed on the record and mentioned, I believe, in the reply brief, if not the original brief, that the vasculitic condition is not related to the work accident. He underwent a course of prednisone treatment for that condition. He presents at the end of February 2009 back to his initial physician, Dr. Sladek. He now has a significant change in that hip condition. It's no longer a rounded head with degenerative changes on it. It's now flattened, consistent with avascular necrosis. And in fact, the doctor who ultimately performed the hip replacement, Dr. Sporer, commented that this gentleman now has avascular necrosis. But wasn't that addressed by Dr. Sladek? Claimant did not start taking prednisone until about February 15, 2008. Dr. Sladek testified it takes months or years for prednisone to result in avascular necrosis. Correct? Exactly. Months or years. We're 14 months later, 12 months later, and he develops this condition. Didn't Sladek and Dr. Gattellis examine the claimant well before he began taking prednisone? Didn't they examine him before he began taking the prednisone? I agree. Your position is that the circuit judge's position was the prednisone. Correct. That caused this flattening? Correct. And there's no evidence to dispute or refute? Sladek testifies that his duties, quote, certainly exacerbated his underlying condition and that his work injury, quote, brought the arthritic condition to the forefront and really started his pain. Gattellis opines that the work accident stirred up the arthritic hip process and that's why he has pain and disability in cranial prime that he had pre-existing osteoarthritis of the right hip that was exacerbated by his injury of June 5, 2007. It only has to be a cause. It doesn't have to be the major cause or anything. A cause. We've got three doctors saying that his work injury exacerbated his condition. Why can't he recover? I didn't hear the last sentence. Why can't he recover if three doctors say his work injury exacerbated his injury? His work activity in June of 2007 did exacerbate his condition for a period of time. It didn't aggravate. It exacerbated. There's a difference in definitions of those words. Tell us what those are. Aggravation is a permanent change in the condition and exacerbation is a manifestation of, in this case, symptoms. He had an exacerbation of his condition. He had no change on x-ray over the course of seven months. He was stable. The x-ray from February 2008 was not compared to the x-rays from June of 2007 through January of 2008. We don't know whether there's any change that Dr. Crane saw in that February 2008 x-ray. We know from June 2007 through January 2008, there was no change per Dr. Sladek, the initial treating orthopod, on x-ray. You know, it seems that all of this was presented to the Commission. The Commission made a determination that it was provided with conflicting medical opinion testimony, decided that Sladek's opinions were more persuasive. The trial court engaged in reweighing the opinion testimony, which is something it should not do. So how is it that that was proper? There are two critical factors. At page, in the appendix of the initial brief, at page A4 in that appendix, the Commission decision reflects that Dr. Sladek, on October 7, 2009, indicates he needed to have a hip replacement performed almost a year ago. So now we're back to October 2008 when he's not under active medical care. He's not seeing a doctor. There's no evidence of record that he's seeing a doctor. And they're relying upon this statement of Dr. Sladek that he needed a hip replacement almost a year ago when Dr. Sladek hadn't seen him at that time for nine months, when he had not seen a doctor for his hip for nine months. And that statement by Dr. Sladek, upon whom the Commission is relying, is completely unsubstantiated by Dr. Sladek's own records. Wait a minute. But if a doctor looks at a condition, why can't the doctor say how long that condition has existed? What's wrong with that? Sladek saw him when he made his opinion, didn't he? When he gave his opinion, Sladek had seen him. So what's wrong with Sladek turning around and saying, I saw him in October of 2009. By the way, this guy has needed a hip replacement for a year. I can tell that by just looking at his hip. Why can't he say that? Well, that would be speculative. What do you mean, speculative? He's a doctor. Your Honor? Everything a doctor does is speculative. Is there any right answer to any question? With all due respect, Your Honor, doctors all the time look at MRI films, they look at x-rays, and they find that they see a condition and make a diagnosis of something that's quiescent. It's not the cause of or contribution of the patient's complaints. They may have, for example, an L5 radiculopathy, but they look at the MRI and they see an L1, L2 disc variation. What are you telling me? Do doctors make mistakes? We know that. But the question is, when Sladek gave his opinion, he has every right in the world to give that opinion as a physician. You didn't move to strike his opinion as being incompetent, did you? I did not. Well, then it goes to wait. And it goes to wait, and that's a commission decision. That's not a judge's decision. And we're stuck with Sladek. We're stuck with Green. We're stuck with Gatillus. And they've got Mercier. You've got Mercier. How does he pronounce his name? Mercier. You've got Mercier. And the commission says, we believe them. And Dr. Marc Levin. And Levin. The other issue... They're the experts. Well, the other issue that respondent has with Dr. Crane's opinion, and if you look at page A3 of the appendix, is the commission played with the words of Dr. Crane's report. Dr. Crane's report of February 28, 2008, from Dr. Crane to the primary care physician, the commission says that he detected additional abnormalities in the right hip. That's not what Dr. Crane's report says. Dr. Crane's letter of February 28, 2008 says, in addition, x-rays of the right hip revealed abnormalities consistent with degenerative arthritis. They were not contemplating surgery at that time. He was under, the report indicates that he was under, or he was back to work, and his condition was not terribly symptomatic at that point. And, in fact, he would say that, he said he may need a hip replacement in the future. Well, I think, you know, if you listen to sports talk radio today, the White Sox are going to win the pennant this year. And as a White Sox fan, that would be wonderful, but it's sheer speculation. Am I correct in reading the February 10th Dr. Crane letter? To Klayman's attorney, that there's a paragraph in there that says, it is my medical opinion that Klayman has osteoarthritis of the hip that was exacerbated by his injury and probably made worse by avascular necrosis. As a result of this problem, he required a total hip replacement, a total hip arthroplasty. Did he write that? I assume that's what the report, it sounds accurate. And he also says, in my medical opinion, that the symptoms of the osteoarthritis were exacerbated by the reported injury that he sustained on June the 5th, 20th. Again, Your Honor, there's no question or no issue, I should say, that there was an exacerbation. He had pain in his hip. He had treatment. He underwent physical therapy. He had an injection in the right hip. He returned to work in a heavy-duty capacity, delivering beer, going up and down stairs. He was discharged from care at maximum medical improvement. He had another condition in his right hip, I'm sorry, he had another personal condition for which he took a medication that is known. All of this was presented before the commission, correct? Absolutely. Okay. Again, I think if... What you're saying is the opposite conclusion. It's clearly apparent. It is. The presence of treatment or condition that is not associated with the injury led to his condition of ill-being. Correct. And we're up here all the time and you're fighting with or debating with us what manifest weight is. Well, I'm telling you today, this is manifest weight. The commission decision is clearly against the manifest weight of the evidence. The arbitration decision should be reinstated and the circuit court affirmed. Thank you. Thank you, counsel. Counsel, you may reply. What's wrong with that? Why isn't that clear, clearly apparent? It has nothing to do, it's just his treatment for this other condition that led to this. There's a reason why the legislature decided a clause was a term they would use, right? Rather than narrowing it down to one cause. And who says it's a cause? What do you have in the record? Well, Dr. Crane, I believe, clearly states it in his report. And Dr. Sladek and Dr. Gatillis mentioned how he's a hip replacement candidate even before he receives the prednisone. So, with respect to the facts in this case, we believe the commission decision should stand. Do any of your honors have any more questions? I don't believe there are any. Thank you, counsel. Thank you, counsel, both. Three arguments in this matter will be taken under       Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.                    Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.